428 So.2d 413 (1983)
STATE of Louisiana
v.
CHAPMAN DODGE CENTER, INC. and John Swindle.
No. 81-KA-3117.
Supreme Court of Louisiana.
February 23, 1983.
Dissenting Opinion March 22, 1983.
Rehearing Denied March 25, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Kay Kirkpatrick, Ralph L. Roy, Asst. Dist. Attys., for plaintiff-appellee.
Larry S. Bankston, Keith D. Jones, Baton Rouge, for defendant-appellant.
FRED C. SEXTON, Jr., Justice Ad Hoc.[*]
Defendants, Chapman Dodge Center, Inc., and John Swindle were charged by bill of information with 20 counts of theft, in violation of LSA-R.S. 14:67. On July 13-16, 1981, defendants were tried before a six person jury which found them guilty of the lesser included offense of unauthorized use of a movable in violation of LSA-R.S. *414 14:68. Thereafter, the trial court sentenced Chapman Dodge Center, Inc., to pay $100 on each of the 20 counts and actual court costs pursuant to LSA-C.Cr.P. Art. 887; in addition to the $100 fines and court costs, defendant John Swindle was sentenced to serve six months in parish prison on each of the 20 counts, the sentences to run consecutively. The sentences were suspended, however, and Swindle was placed on two years supervised probation, with the special conditions that he:
(a) Make restitution to each of the victims listed in the bill of information for their loss and inconvenience pursuant to LSA-C.Cr.P. Art. 895.1, (total sum of $8,460.35); and
(b) Serve five days in jail on each count, or in lieu thereof serve five days on the City-Parish litter detail on each count.
The defendants have appealed citing 14 assignments of error. We reverse as to both defendants on the assignment of insufficient evidence and pretermit discussion of the other assignments of error.
FACTS
Chapman Dodge Center, Inc., a Baton Rouge Dodge dealership, closed its doors because of financial difficulty on September 12, 1980. Shortly thereafter the district attorney's office began receiving complaints from Dodge customers that they had not received their permanent license plates for their cars because the dealership had neither registered the cars purchased, nor paid the sales tax due. The usual practice was for the customer to pay the amount due for sales tax to the car dealer who, in turn, would register the car with the state and tender the tax. After a car is registered and the tax paid, the state issues a permanent license plate. In the meantime, the dealership is authorized to give the customer a temporary plate that is valid for 35 days. Dodge customers were being stopped for expired temporary license plates since they had not received their permanent tags.
Chapman Dodge had been in financial trouble for about a year prior to its closing. Aside from the general economic situation, Chapman's difficulties were due in great part to Chapman's financial relationship to the financially troubled Chrysler Corporation. According to the trial record, at the time Chapman closed, Chrysler Corporation owed between $250,000 and $400,000 to Chapman Dodge. In addition, Chrysler Credit Corporation, a subsidiary of Chrysler Motors, had $140,000 of Chapman's money "on reserve" for potential losses on loans Chrysler Credit made to Chapman customers.
After Chapman Dodge closed its doors, Chrysler Credit Corporation took possession of Chapman Dodge. On the premises, employees of Chrysler Credit Corporation found between 180 and 190 registration forms for purchased cars which had not been filed with the state and for which no sales tax had been paid. Since Chrysler Credit Corporation owned the mortgages on 159 of these cars, it paid the sales taxes due on them (approximately $68,000) in order to register the cars and the chattel mortgages with the state.
The defendant, John Swindle, personally paid the sales taxes (about $11,000) on the remaining cars which had not been financed by Chrysler Credit Corporation. The defendant did so after he was notified by the district attorney's office that the taxes were due. The defendant's attorney in Mississippi, however, testified that he advised the defendant that Chrysler Credit Corporation should be responsible for all taxes due since it had possession of all of Chapman Dodge's assets, and was therefore responsible for discharging Chapman's tax liability.
The original bill of information charged 159 counts of theft, but was later amended to 20 counts with a reservation to prosecute the remaining 139 at a later time.
Defendant John Swindle testified that he was the sole owner of Barony Corporation, a holding company for several food service corporations. Barony Corporation owned a subsidiary called Center Management which was formed to hold automobile dealerships when Swindle expanded his operations to include that business. Chapman Dodge was *415 one of four dealerships owned by Center Management. Center Management, after acquiring the necessary funding, then purchased Chapman Dodge. Subsequently Chapman Dodge endorsed the notes Center Management had signed in obtaining financing. Each month a check was sent by Chapman Dodge to Center Management to cover the payment due by Center Management on the notes.
The evidence showed that the defendant, a resident of Jackson, Mississippi, was seldom at the dealership more than twice a month. It was Donald Barrett that was in charge of the daily operations of Chapman Dodge as general manager. All department managers were responsible to Barrett, who in turn answered to Swindle. According to the testimony of James Duvall, Chapman Dodge's accountant, he and Barrett made the decisions as to which bills were to be paid.
Swindle testified that when the dealership was showing continued financial trouble, he discussed this matter with James Duvall. Since the dealership was behind in paying withholding taxes, as well as sales taxes, he ordered Duvall to pay all of the taxes owed, particularly the federal withholdings. When the dealership was closed, Swindle asked Barrett if all the taxes had been paid. The record shows that in the presence of Johnilyn Smith, an administrative assistant to Swindle, and Frank Peel, a business associate of Swindle, Barrett stated that all taxes had been paid. Barrett testified that he did not say all the taxes had been paid, only that the federal taxes had been paid. On cross-examination however Barrett stated that he "may" have said that all the taxes were paid.
The defendant received no indication that the sales taxes were not paid until a week or ten days after closing the dealership when the district attorney contacted Chapman Dodge's lawyer. Duvall testified that he was instructed by Donald Barrett to retain the sales tax money. Donald Barrett however testified that he had told James Duvall in June of 1980 to pay only those obligations necessary to keep the dealership open; but that he never told Duvall to retain the contracts and sales taxes on the purchased vehicles.
Donald Barrett was originally indicted on the theft charges along with John Swindle and Chapman Dodge. Both he and James Duvall were granted "use" immunity in order to compel their testimony against Chapman Dodge and John Swindle. Duvall was granted immunity at the preliminary examination. Barrett was granted immunity when his counsel invoked his privilege against compulsory self-incrimination when he was called to testify at the trial. Barrett stated on cross-examination that the district attorney's office had told him three weeks earlier that he would not be prosecuted if he testified for the state.

OPINION ON SWINDLE
John Swindle was charged with the crime of theft. The jury, however, apparently found that the elements of theft had not been proven by the state and returned a verdict of the lesser included offense of unauthorized use of a movable. Unauthorized use of a movable is defined in LSA-R.S. 14:68 as follows:
"Unauthorized use of a movable is the intentional taking or use of a movable which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently. The fact that the movable so taken or used may be classified as an immovable, according to the law pertaining to civil matters, is immaterial."
We find that the evidence produced at trial was insufficient to show that Swindle had the necessary criminal intent to commit the crime of unauthorized use of a movable.
Unauthorized use of a movable requires an "intentional taking or use of a movable." LSA-R.S. 14:68. In the recent case of State v. Bias, 400 So.2d 650 (La.1981) involving the non-payment of rental on a television set, this court, in setting aside the conviction, stated that:
"A person commits the crime of unauthorized use of a movable when he either *416 takes or uses another's property without the owner's consent or by means of fraudulent practices. R.S. 14:68, although not requiring that a person act with an intent to deprive the owner permanently of his property, must reasonably be construed to require the existence of fraudulent intent." (emphasis original).
In the instant case, the state has failed to prove any intent on the part of Swindle, fraudulent or otherwise. The facts show that Swindle was the owner of a corporation (Barony) which owned another corporation (Central Management) which in turn owned Chapman Dodge, Inc. Swindle, although the actual owner of Chapman Dodge, had very little control over its day to day operations. The testimony of Duvall indicated that he and Donald Barrett were responsible for the daily operation of the business.
Swindle had little contact with the dealership. The testimony reveals that Swindle was seldom at the dealership more than twice a month, since he resided in Jackson, Mississippi.
Aside from the lack of contact with the dealership, the most convincing evidence as to Swindle's lack of intent, was the testimony of James Duvall. Duvall stated that Swindle had instructed him to pay the taxes. This, in our mind, certainly negates any fraudulent intent on the part of Swindle and shifts the blame elsewhere. Also important, is the testimony of several witnesses for the defense, who stated that Donald Barrett, upon being asked by Swindle, had informed him that "all the taxes had been paid."
Thus the record is devoid of any evidence indicating that Swindle issued direct orders, or even implied, that the taxes in question were not to be paid. Certainly it is less than clear from the record who made the decision, but we feel that the evidence shows that it was not Swindle. In summary, there is insufficient evidence that Swindle had sufficient fraudulent intent to commit the offense of unauthorized use of a movable. There may be various civil wrongs for which the defendant Swindle is responsible, but the requisite mens rea or criminal intent necessary to hold this defendant responsible for a criminal offense is lacking. State v. Bias, supra.
Therefore under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 560, we find that after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found that the essential elements of unauthorized use of a movable had been proven beyond a reasonable doubt. The state failed to adduce any evidence whatsoever regarding John Swindle's intent to commit a crime, and with the element of mens rea unproven, this conviction must be reversed.

OPINION ON CHAPMAN DODGE
The question of the criminal liability of the corporate defendant in this cause is a more difficult proposition involving fundamental issues of the nature of criminal responsibility. These issues have not been generally considered with respect to corporations in this jurisdiction. Certainly our law contemplates corporate criminal defendants. See LSA-C.Cr.P. Arts. 212[1] and 836.[2] Louisiana law delineates a number of acts the commission or omission of which creates corporate criminal responsibility.[3]
*417 The problem of what criminal liability a corporation should bear for the unauthorized acts of its officers and managers is indeed a grave and troubling one. Recent allegations of corporate responsibility for large train derailments and massive pollution of water sources underscore the importance of this troubling topic. Certainly there is civil responsibility under such circumstances. The question is whether a corporation should be criminally responsible in the absence of a specific statute which defines and describes the corporate act, prohibits that act, and establishes a specific punishment therefor.
Criminal liability in our system of justice has always been founded upon the simultaneous existence of two distinct elements namely: (1) actus reus, and (2) mens rea. The existence of only one of these elements does not make one criminally liable. Both must be present to invoke the sanctions society has placed on what is termed "criminal conduct." Certainly one cannot be held criminally liable for simply thinking of a criminal act without the act occurring. See LSA-R.S. 14:8 and comments, LSA-R.S. 14:27. A somewhat more difficult, but logically consistent idea, is that an act, committed without the required criminal intent or mens rea, is not criminally punishable. We do not criminally punish those that do not know what they are doingsuch as the insane. Neither do we punish those who, while aware of what they are doing, have no control over their actionsthe victims of threats or coercion. We do not impose criminal liability on those who act without criminal intent for the simple reason that such an imposition would not achieve the main goal of our criminal law: deterrence.
Given these basic ruminations on the topic of criminal intent, we should now consider the nature of a corporation. Our Civil Code in Article 427 defines a corporation as:
"... an intellectual body, created by law, composed of individuals united under a common name, the members of which succeed each other, so that the body continues always the same, notwithstanding the change of the individuals which compose it, and which, for certain purposes, is considered as a natural person." (emphasis added).
The corporation as a fictitious person is capable of entering into contracts, owning property and making and receiving donations. In short, it is capable of doing virtually anything that a natural person is capable of doing.
A corporation by the very nature of its operation is dependent upon people to carry out its business. Some of these people may rightfully be regarded as the "mind" of the corporation. This group, known as the board of directors, is responsible for the direction that the corporation takes in its business activity. Plans for the corporation, developed by the board of directors, are transmitted to the officers of the corporation and through them to the employees. This latter group may be regarded as the "hands" of the corporation. But here our analogy to the human form must end. For unlike ordinary human hands, corporate "hands" have minds of their own and are capable of self direction.
When a corporation is accused of committing a crime which requires intent, it must be determined who within the corporate structure had the intent to commit the crime. If the crime was the product of a board of directors' resolution authorizing its employees to commit specific criminal acts, then intent on the part of the corporation is manifest. However, a more difficult question arises if the crime is actually committed by an employee of the corporation not authorized to perform such an act. Holding a corporation criminally responsible for the acts of an employee may be inconsistent with basic notions of criminal intent, since such a posture would render a corporate entity responsible for actions which it theoretically had no intent to commit.
Common law jurisdictions hold corporations criminally liable for the acts of low-ranking employees. In such jurisdictions, corporate criminal liability is based on an *418 extension of the tort doctrine of vicarious liability.[4] The theme of vicarious criminal liability, however, is varied. Some jurisdictions impose criminal liability where there has been an act or an authorization to act by a managerial officer,[5] some where there has been an act committed within the scope of the actor's employment,[6] and still others where there has been an act done which benefits the corporation.[7] These varied applications notwithstanding, common law jurisdictions have found corporations liable for forms of homicide, theft, extortionin short, virtually every crime other than rape and carnal knowledge.[8]
Although this merger of tort and criminal law doctrine has found wide acceptance, it has also generated significant theoretical problems. Admittedly, tort law and criminal law are cousins, causing concern as to whether their relationship is within the prohibited degree such that a union of the two might produce unwanted offspring. It should be remembered that the main function of the law of torts is compensation and to a much lesser degree, deterrence.
Tort law attempts to distribute the loss of a harmful occurrence. Causation is the important ingredient therein. Holding a corporation vicariously liable for the torts of its employees dovetails with the idea of compensating the victim. The corporation is in a more likely position to compensate.
On the other hand, as mentioned earlier, the primary function of criminal law is to deter future criminal liability. To impose such liability on another party who had no part in the act and, as in the case of most corporate crimes, no intent to commit such an act, seems at first glance to be contrary to the purpose of our criminal legal system.
It is important to point out that while corporate criminal liability is recognized and applied in common law jurisdictions, the maxim that societas delinguere non potest (a corporation cannot do wrong) is still firmly recognized in the civil law.[9] Only the natural person acting for the corporation can incur criminal guilt. Courts cannot, as often occurs in common law jurisdictions, convict the corporation alone so that the individual defendant may escape punishment.[10]
In France, the jurisdiction recognized most often as our principal civilian ancestor, *419 the courts reason that corporate criminal liability is irreconcilable with the principle of guilt.[11] Corporate criminal liability is considered ineffective as a deterrent because it is deterrence addressed to no mind at all. The same line of thinking with no material difference is followed by virtually every other civil law country.[12]
One of the most interesting aspects of the concept that a corporation may be guilty of an offense without specific statutory authority is the question of how one punishes a corporation. It cannot be imprisoned. LSA-C.C. Art. 441. Obviously it may not be sentenced to death in the sense that an individual may be. Of course, the charter may be revoked but obviously in that circumstance there would have to be a statute which authorizes this sanction.
The only method of punishing a corporation that is guilty of an offense not proscribed to corporations statutorily is by the imposition of a fine. Certainly it may be argued that a fine in such instances punishes those not guilty of the offense, for funds lost from the corporate treasury can be recouped either by withholding dividends from shareholders or increasing the price of the product to the consumer. On the other hand, serious fines levied against corporations can modify the behavior of corporate officers who want to keep their jobs, and the behavior of voting shareholders who will vote to elect officers that will avoid such costly fines. But obviously there are certain theoretical inconsistencies between a fine to a corporation for an offense not delineated statutorily and the concept that the purpose of criminal statutes is to punish and deter.
But the most interesting theoretical problem arising from the idea that a corporation may be fined where it commits an offense such as theft or unauthorized use is presented by contemplation of the converse. What punishment should be exacted where the authorized penalty is only a jail term? This dilemma would arise if one of the managers or upper level employees of a company authorized the burglary of the home of a senior officer of a competitor in order to obtain vital information.[13] It would then not be possible to effectively punish the corporation as the burglary of an inhabited dwelling requires a minimum jail sentence which cannot be suspended.
These are interesting theoretical problems some of which are actually presented by the circumstances of this cause and others which arise more indirectly as extensions of those actually presented.
The instant defendant is a closely held holding corporation which is accused of a basic "Ten Commandment Crime"theft and convicted of a lesser included offense. Thus the finder of fact in effect determined that the defendant corporation kept the money in question with fraudulent intent, but with the intent to eventually return the funds. The evidence further indicates that "retention" of the funds was not specifically authorized by the board of directors or by the president or any other officer of the corporation. The record does not indicate, moreover, that any of these entities had any real knowledge of that action. Of course the corporation, its board of directors, its parent corporations and its president are for all practical purposes the same entity the individual defendant Swindle. Furthermore, as discussed earlier, the evidence preponderates that it was a party other than Swindle who determined to "retain the funds."
Thus, the facts of this case can be narrowed to a fine point. In so doing, however, broad questions of a complex nature are visited upon us. While recognizing the potential disservice to the jurisprudence we are nevertheless unable, within the confines of this appeal, to resolve these extremely complex issues. We simply determine that under the circumstances of this case, criminal *420 intent has not been adequately established. We determine that under the circumstances of this case, there was insufficient intent shown in the trial court to withstand a Jackson v. Virginia analysis, and therefore this corporate defendant may not be found criminally responsible. We hold that since this record reveals no evidence of complicity by the officers or the board of directors, explicit or tacit, that the actions of these managers and/or employees were insufficient to cause this corporate entity to be guilty of the offense of an unauthorized use of a movable.
We thus reverse as to both defendants and order their discharge.
REVERSED AND DISCHARGED AS TO BOTH DEFENDANTS.
LEMMON, J., dissents and assigns reasons.
LEMMON, Justice, dissenting in part.
The evidence supports a conclusion that a high managerial agent, in whom the corporation had vested the authority to manage its day-to-day business operations, knowingly committed a criminal offense on behalf of the corporation and for its benefit while acting in the scope of his employment. The corporation should therefore be held criminally liable. See Model Penal Code § 2.07(1)(c); State v. Adjustment Department Credit Bureau, Inc., 94 Idaho 156, 483 P.2d 687 (Idaho 1971); Commonwealth v. Beneficial Finance, 360 Mass. 188, 275 N.E.2d 33 (Mass.1971); C.I.T. Corp. v. United States, 150 F.2d 85 (9th Cir.1945).[1]
NOTES
[*] Judges Fred C. Sexton, Jr., and William Norris, III, of the Court of Appeal, Second Circuit, and Judge Robert L. Lobrano of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice John A. Dixon, Jr., and Associate Justices Walter F. Marcus, Jr., Fred A. Blanche, Jr., and Harry T. Lemmon.
[1] Article 212 provides in pertinent part that:

"When a corporation, or partnership, or other association of persons not incorporated, is charged with the commission of an offense, the court before which the case is to be tried shall issue a summons stating the offense charged and ordering the defendant to appear before the court at a time and place stated in the summons."
[2] Article 836 provides that:

"When a corporation, partnership, or other association is a defendant, the requirements of this Title are fulfilled if its counsel is present."
[3] LSA-R.S. 12:172 (Failure to Keep Records); LSA-R.S. 37:850 (Violation of Embalming Laws); LSA-R.S. 14:106 (Obscenity); LSA-R.S. 47:1953 (Tax Assessment of Corporations); LSA-R.S. 51:125, 126 (Transactions Lessening Competition); LSA-R.S. 30:217 (Unauthorized Prospecting); LSA-R.S. 30:1096 (Pollution).
[4] Mueller, Mens Rea and the Corporation, 19 U.Pitt.L.Rev. 21, 39 (1957); Lee, Corporate Criminal Liability, 28 Colum.L.Rev. 1 (1928).
[5] People v. Green, 22 Cal.App. 45, 133 P. 334 (Cal.Dist.Ct.App.1913); Commonwealth v. Sacks, 214 Mass. 72, 100 N.E. 1019 (Mass. 1913); See also Developments in the Law Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions, 92 Harv.L.Rev. 1227 (1979).
[6] United States v. Hilton Hotel Corporations, 467 F.2d 1000 (9th Cir.1972); United States v. Armour & Co., 168 F.2d 342 (3rd Cir.1948); United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174 (3rd Cir.1970); United States v. Harry L. Young & Son, Inc., 464 F.2d 1295 (10th Cir.1972); See also Sanctions, supra note 5.
[7] Standard Oil Company of Texas v. United States, 307 F.2d 120 (5th Cir.1962); United States v. Carter, 311 F.2d 934 (6th Cir.1963); United States v. Empire Packing Co., 174 F.2d 16 (7th Cir.1949); See also Sanctions, supra note 5.
[8] Commonwealth v. Mcllwain School Bus Lines, Inc., 283 Pa.Super. 1, 423 A.2d 413 (Pa. Super.Ct.1980); State v. Adjustment Department Credit Bureau, Inc., 94 Idaho 156, 483 P.2d 687 (Idaho 1971); State v. Worker's Socialist Publishing Co., 150 Minn. 406, 185 N.W. 931 (Minn.1921); Dept. of Health of State of N.J. v. Borough of Ft. Lee, 108 N.J.Eq. 139, 154 A. 319 (N.J.Ch.1931); People v. Canadian Fur Trappers' Corp., 248 N.Y. 159, 161 N.E. 455 (N.Y.1928); Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294, 52 N.E. 445 (Mass.1899); State v. LeHigh Valley R. Co., 90 N.J.L. 372, 103 A. 685 (N.J.1917); State v. Rowland Lumber Co., 153 N.C. 610, 69 S.E. 58 (N.C. 1910); Kaufman v. U.S., 212 F. 613 (2nd Cir. 1914); State v. Ice and Fuel Co., 166 N.C. 366, 81 S.E. 737 (N.C.1914).
[9] See Mens Rea and the Corporation, supra note 1, at 28. Also it should be noted that until 1942, La.Rev. Civil Code of 1870, Article 443 expressly stated that a corporation could not be convicted of any crime. See also Music Box, Inc. v. Mills, 10 La.App. 665, 121 So. 196 (La. 1929).
[10] See United States v. General Motors Corporation, 121 F.2d 376, 411 (7th Cir.1941) and American Medical Association v. United States, 130 F.2d 233, 253 (D.C.Cir.1942).
[11] Mens Rea and the Corporation, supra note 4, at 29.
[12] Mens Rea and the Corporation, supra note 4, at 34.
[13] Watergate revisited.
[1] See also Study Draft for a New Federal Criminal Code, § 402 (1970), and Senate Bill 1437 of the 95th Congress, which provided:

"§ 402. Liability of an Organization for Conduct of an Agent.
"An organization is criminally liable for an offense if the conduct constituting the offense, in whole or in part:
"(a) is conduct of its agent, and such conduct:
"(1) occurs in the performance of matters within the scope of the agent's employment or within the scope of the agent's actual, implied, or apparent authority; or
"(2) is thereafter ratified or adopted by the organization; or
"(b) involves a failure by the organization or its agent to discharge a specific duty of conduct imposed on the organization by law."