686 So.2d 101 (1996)
STATE of Louisiana
v.
Patrick F. BELINO.
No. 96 KA 0789.
Court of Appeal of Louisiana, First Circuit.
December 20, 1996.
*102 Scott C. Gardner, Covington, and William R. Campbell, Jr., New Orleans, for State of Louisiana.
Herbert R. Alexander Mandeville, for Defendant-Appellant.
Before SHORTESS, LeBLANC and TANNER, JJ.[1]
SHORTESS, Judge.
Patrick F. Belino (defendant) was charged by bill of information with possession of 400 or more grams of cocaine with intent to distribute, La. R.S. 40:967(A)(1) and 40:967(F)(c), and conspiracy to possess cocaine with intent to distribute, La. R.S. 14:26 and 40:967(A)(1).[2] He was billed jointly with three alleged coconspirators, and they were tried together. He was convicted on both counts, as were his codefendants. The trial court sentenced defendant to serve fifteen years for possession, with credit for time served,[3] and ten years for conspiracy, with *103 the ten-year sentence to be served concurrently with the fifteen-year sentence. Defendant's motions for new trial and postverdict judgment of acquittal were denied. He appeals, raising as the sole issue that the evidence was insufficient to support the convictions.

UNDISPUTED FACTS
The following facts are undisputed. Andrew Chambers is a confidential informant or cooperating individual who has assisted the federal Drug Enforcement Administration (DEA) and state law enforcement agencies for the past eleven years by posing as a drug dealer. In March 1994 Chambers went to Gulfport, Mississippi, to visit a young woman. While there, he met Ricky K. Bane. Three days later Chambers returned to the woman's house, but she was not home. He visited with Bane, and the conversation turned to selling drugs. Chambers offered to pay Bane if he could find individuals to buy at least a half kilogram of cocaine. Eventually Bane introduced Chambers to two of his friends, Tracy Stubbs and Steven Dunn. Stubbs and Dunn agreed to buy one-half kilogram of cocaine from Chambers for $10,000.00. Chambers got in touch with his contacts at the DEA, and Lieutenant Timothy A. Lentz, commander of the narcotics division of the St. Tammany Parish Sheriff's Office (STPSO), provided a kilogram of cocaine from the STPSO evidence room.
A few days later, on March 14, 1994, Bane, Stubbs, and Dunn rode from Gulfport to Slidell, Louisiana, in a small Toyota automobile driven by defendant. Stubbs was in the front passenger seat. They stopped in front of a motel, and Bane and Dunn got out of the back seat. They met Chambers and went to a motel room, where an undercover DEA task force agent, Tim Magruder, posing as a drug dealer, waited.
Meanwhile, defendant and Stubbs drove to the rear of the motel and backed into a parking space. They got out of the car, walked toward the motel, and then returned to their seats in the car.
In the motel room, Chambers produced the cocaine, which Dunn tested. Chambers and Bane then walked from the motel toward the car in the parking lot. Stubbs got out and met them in front of the car. They talked, then walked to the passenger side. Stubbs got $5,000.00 from the glove compartment, hid it in his pants, and returned to the motel room with Chambers. Bane took Stubbs's place in the passenger seat of the car. Except for his brief walk with Stubbs toward the motel immediately after they parked, defendant stayed in the driver's seat of the car during the entire incident.
In the motel room, Stubbs reluctantly tested the cocaine and produced the money from his pants. Dunn took $5,000.00 from his tennis shoes and gave it to Chambers. While they were counting the money, agents burst into the room and arrested Stubbs and Dunn. Other agents arrested Bane and defendant as they sat in the car. Two guns were found in the car.

LAW
Defendant was charged both as a principal and as a coconspirator to possession of four hundred grams or more of cocaine with intent to distribute. The parties stipulated the substance involved in this transaction was cocaine, and the quantity is not disputed in this appeal. The remaining elements of the possession charge are that defendant knowing or intentionally possessed the drug and specifically intended to distribute it. La. R.S. 40:967(A).
An individual is a principal to a crime if he is "concerned in the commission of a crime." He need not be present when the crime is committed and need not commit the act directly. He is a principal if he aids and abets in the commission of the crime or directly or indirectly counsels or procures another to commit the crime. La. R.S. 14:24. However, only those persons who knowingly participate in the planning or execution of a crime are principals; a defendant may be convicted as a principal only for those crimes for which he personally had the requisite *104 mental state. State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428.
An individual is a criminal conspirator if he makes an agreement with one or more persons for the specific purpose of committing any crime and at least one of the parties does an act in furtherance of the object of the agreement. La. R.S. 14:26(A). The elements of conspiracy may be proven by direct or circumstantial evidence. State v. Daniels, 607 So.2d 620, 623 (La.App. 2d Cir. 1992). Where the parties to a drug transaction act in a manner consistent with an agreement, the jury may conclude the parties are "the gears in a drug distribution machine they created." Daniels, 607 So.2d at 624.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). When circumstantial evidence is used to prove the commission of an offense, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. This standard is not purely separable from Jackson; all the evidence must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965, 968 (La.1986). Applying this standard, we must determine (1) whether the State proved defendant acted as a principal by intentionally or knowingly aided and abetted his codefendants in possessing cocaine with the intent to distribute it, and (2) whether the State proved defendant made an agreement with his codefendants, i.e., conspired, to commit the crime of possession of cocaine with intent to distribute.

WHAT WAS DEFENDANT'S ROLE?
The State contends defendant drove the coconspirators to Slidell, was a vigilant, armed lookout while the sale was being consummated, and procured money from the glove compartment of the Toyota for the purchase of the cocaine. Defendant does not dispute he drove the codefendants to Slidell but contends he was never physically or constructively in possession of cocaine. Our review of the testimonial and taped evidence reveals the following.
Bane took the stand against his attorney's advice. He testified he had known Stubbs and Dunn for many years, but he had never met defendant before the morning of the drug transaction. He knew nothing about him and did not know who arranged for him to drive. He admitted introducing Stubbs and Dunn to Chambers as potential cocaine buyers, which he did only because he had financial difficulties and Chambers promised to pay him $500.00.
Bane testified that on the day of the transaction, he thought they were going to the mall in Slidell, and as far as he knew, defendant thought the same. During the drive from Gulfport to Slidell the drug transaction was not mentioned. Before they got to the mall, they stopped at a McDonald's restaurant. Defendant stayed in the car while Dunn and Bane went inside to eat. While they were inside, they were beeped by Chambers; defendant could not have overheard their telephone conversation. After that call, their plans changed. Bane testified he thought they were going to a party at the motel.
Bane's cross-examination testimony regarding defendant's knowledge of the transaction was as follows:
[Prosecutor] Q. And isn't a fact that [defendant] was brought there in order to have somebody with a gun in order to see if something went wrong? Isn't that why they backed that car in?
A. I just met Patrick. I don't know. We didn't talk about none of this, so I couldn't tell you none of that.
Q. [Defendant] knew nothing about this?
A. To my knowledge, [defendant] knew nothing.
The State does not dispute that defendant did not participate in, nor was he mentioned in, any of the telephone calls or *105 conversations between Chambers and the codefendants. He never entered the motel room where the drug sale took place. While Chambers was walking to the Toyota with Bane, Magruder chatted with Dunn in an attempt to gain further information. He asked Dunn who was working for him. Dunn replied there were just the three of themhis cousin, his brother, and himself. None of the witnesses knew of any familial relationship between Dunn and defendant, but no relationship between Dunn, Stubbs, and Bane was shown either.
Defendant's two main connections with this transaction, according to the State, were that he maintained an armed lookout in the car during the transaction and that he "retrieved approximately $5,000.00 from the glove compartment of the vehicle and gave the money to Stubbs." We shall examine those allegations separately.
Was defendant armed?
Emile Larson, a Jefferson Parish sheriff's deputy assigned to the DEA task force, was conducting outside surveillance in the parking lot of the motel. He and John Scallan, a STPSO detective, were in the back of a Ford Explorer. The Explorer and the Toyota were parked with one vacant space between them, facing in opposite directions. He and Scallan were slumped down to avoid detection. They were watching the Toyota through the side window of the Explorer. Scallan was behind Larson and was operating a video camera over Larson's shoulder.
Larson testified defendant sat in the car as if waiting for something. He saw defendant adjust his pants waistband underneath his shirt. He believed from these movements that defendant had a gun, but he could not see clearly. A few minutes later he saw defendant pull a gun from his waistband and slide it into his lap. He saw the gun for only a second because his view was blocked by the car door, but he stated his view was much better than the view shown on the video. On direct examination, Larson stated, "I see the weapon go forward into his lap area, but that's as far as I can see." Under cross-examination, Larson admitted he could not see a gun at first, but he was certain he saw it later: "It's not shown in the photograph, but the point later on in the video where he removes it from his [waistband] and places it into his lap area, I see the gun come out of his [waistband] and go forward into the vehicle."
Scallan testified Larson called his attention to "a movement that we appeared to believe" was defendant putting a gun in his waistband. Defendant's shirttail was hanging out, however, so they could not see the gun. Scallan made no mention of defendant moving a gun from his waistband to his lap, even though he testified his main focus during the surveillance was on defendant because he believed he had a gun.
Chambers observed defendant in the driver's seat when he went to the car with Bane. He made no mention of seeing a gun in defendant's possession.
We have observed the surveillance videotape made by Scallan. Defendant's movements that indicated the presence of a weapon to Larson and Scallan appear ambiguous to us. We were unable to see a gun during any portion of the videotape. It is not unreasonable, however, to believe Larson's naked-eye view was better than the view seen on the videotape.
There was no gun in defendant's possession when he was arrested. From the videotape it appears he had no time to hide a gun when the "takedown" began. Two guns were found in the car, and it is undisputed that one of them was under the floor mat on the passenger side. The location of the other gun is the subject of conflicting testimony. Larson and Scallan were only one parking space away when the takedown began. Scallan testified he did not arrest anyone or seize any evidence. Pete Orosz, a special agent with DEA assigned to "perimeter outside surveillance," testified Larson was the first officer to reach defendant. Larson testified, however, that when he got to the Toyota, defendant had already been removed from the car, cuffed, and placed on the ground. He did not retrieve a gun or any other evidence from defendant's person, but he was later "presented with a weapon" he believed was seized from the car's console area.
*106 Orosz testified he never saw a gun in defendant's hand or waistband. After defendant had been cuffed and placed prone on the ground, he saw a gun on the floorboard on the driver's side. He testified he did not seize that gun; he believed Mike Hargroder had done so.
Hargroder is a deputy with the STPSO assigned to the DEA task force. He was part of the outside surveillance team. He arrested Bane and seized the weapon under the passenger-side floor mat, but he did not physically participate in defendant's arrest or the seizure of the other gun. He believe Larson or Peter Woods had retrieved that gun. Peter Woods did not testify.
Bane testified an agent removed the second gun from the area between the passenger seat and the console, "stuck down in the side of it." He denied that it was sitting on top of the console or on the floorboard on the driver's side. He stated the agent who seized the gun did not testify.
Orosz testified the guns were not dusted for fingerprints, and no one checked the registration on the guns. There was no evidence that defendant owned the gun or even that he owned the car.
Did defendant retrieve money from the glove compartment?
The State contends in its brief that defendant retrieved $5,000.00 from the glove compartment and handed it to Stubbs. This is an exaggeration of the facts, even examining them in the light most favorable to the prosecution. The State's most favorable witness on this point is Chambers. Chambers testified that when Bane, Stubbs, and he walked to the passenger door, defendant "reached over and popped" the glove compartment, and Stubbs grabbed the money, turned away from the car, and stuffed it in his pants. Chambers was not sure if the money was in plain view in the glove compartment; he admitted it could have been in a brown paper bag.
Larson testified Stubbs got into the car. When he got out, Larson saw him "fooling with something" in his waistband. He did not see what, if anything, Stubbs took from the car. He stated defendant did not reach toward the glove compartment.
Scallan testified Stubbs did not get into the car but just leaned into the vehicle through the open door. He stated defendant stayed in the passenger seat; he did not lean over and put his hand in the glove compartment.
The videotape shows Stubbs leaning into the open passenger-side door as described by Scallan. It is difficult to tell whether defendant moved toward the glove compartment, but it does not appear he handed anything to Stubbs.
Magruder testified that when Stubbs removed the money from his pants, in the motel room, the money was visible and was not in a bag. We have reviewed the motel-room surveillance tape and find it impossible to determine whether the money was in a bag, although Stubbs appears to remove something from around the money.

WAS THE EVIDENCE SUFFICIENT?
The State presented little direct evidence that defendant knew his codefendants planned to buy drugs. The circumstantial evidence against defendant is less than overwhelming. Taking the evidence in the light most favorable to the State, defendant drove a small car containing three other men, $10,000.00, and two guns from Gulfport to a motel in Slidell. He remained in the car while a drug transaction took place. According to Larson's testimony, he was armed. According to Chambers' testimony (and contrary to Larson's), he opened the car's glove compartment to permit one of the men involved in the transaction to retrieve $5,000.00.
Although less than overwhelming, this direct evidence, combined with the circumstantial evidence, is sufficient to permit a rational juror to infer defendant was serving as an armed lookout during the drug transaction. In doing so, he aided and abetted the codefendants and thus was a principal to the crime they committed. He also acted in a manner consistent with an agreement or conspiracy, so that the jury could conclude he was one of the "gears in a drug distribution *107 machine" created by the codefendants. Thus, his convictions must be affirmed.
AFFIRMED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The bill of information contains typographical errors. The indictment lists only La. R.S. 40:967(F)(c) for the possession charge. However, section F(c) simply states the penalty for that crime. The statute for conspiracy is also miscited as "La. R.S. 40:26:967 A(1)." Defendant did not complain of these errors in the trial court and does not assign them as error on appeal. In any event, the errors are harmless. La. C. Cr. P. art. 487.
[3] We note the existence of a patent sentencing error. Louisiana Revised Statute 40:967(F)(c) requires the imposition of a fine of not less than $250,000.00 nor more than $600,000.00. On appeal, however, this court cannot correct such an illegally lenient sentence. See State v. Fraser, 484 So.2d 122, 125 (La.1986).