STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2019 KA 1143

STATE OF LOUISIANA

VERSUS

MILLENNIUM HEALTH CARE SERVICES

JUDGMENT RENDERED: __IJUN 2 2 2021__

* * * * * * *

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number 02-12-0330 • Division J • Section 8

The Honorable Trudy M. White, Judge Presiding

* * * * * * *

La'Deisha Woods
Port Allen, Louisiana

COUNSEL FOR APPELLANT
DEFENDANT—Millennium Health
Care Services, L.L.C., d/b/a
Millennium PCA Services


Tasha K. Stockwell
*Assistant Attorney General*
Baton Rouge, Louisiana

COUNSEL FOR APPELLEE
State of Louisiana


* * * * * * *

BEFORE: WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

**WELCH, J.**

The defendant, Millennium Health Care Services, LLC, d/b/a Millennium PCA Services, was charged by grand jury indictment with one count of conspiracy to commit forgery (count I), a violation of La. R.S. 14:26 and 14:72; nineteen counts of forgery (counts II – XX), violations of La. R.S. 14:72, and one count of theft by fraud (value over $500.00) (count XXI), a violation of La. R.S. 14:67.[1] Following a jury trial, it was found guilty as charged on all counts. On count I, it was fined $2,500.00. On counts II – XX, on each count, it was fined $5,000.00.[2] On count XXI, it was fined $10,000.00.[3] It was also ordered to pay $6,985,249.73 in restitution. Thereafter, the court deleted the order to pay restitution. The defendant now appeals challenging the sufficiency of the evidence, claiming the trial court erred in denying its request for a bill of particulars, claiming the trial court failed to review the record before denying post-trial motions and imposing sentence, challenging the record as incomplete for review, and claiming the trial court erred in accepting a verdict of guilty against both the defendant and Dwaine Woods. For the following reasons, we reverse the convictions and sentences.

## FACTS

In 2004, Dwaine Joseph Woods, Sr., founded Millennium Health Care Services, LLC (Millennium or the defendant), which did business as Millennium PCA (personal care assistance) Services. He designated himself as the president of

---

[1] Dynetta Hadrick Woods was charged by the same indictment with the first twenty counts. Dwaine Joseph Woods, Sr. was charged by the same indictment with the same offenses. Dynetta and Dwaine Woods separately appeal from their convictions. See **State v. Woods**, 2019-1141 (La. App. 1st Cir. 6/4/21), ___ So.3d ___ and **State v. Woods**, 2019-1142 (La. App. 1st Cir. 6/16/21), ___ So.3d ___.

[2] The minutes reflect that, on counts II-XX, the defendant was sentenced to pay a fine of "$5,00." The transcript, however, reflects that, on counts II-XX, the defendant was sentenced to $5,000.00 on each count. When there is a discrepancy between the minutes and the transcript, the transcript must prevail. **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).

[3] The minutes reflect that, on counts XXI, the defendant was sentenced to pay a fine of "$10,00." The transcript, however, reflects that, on count XXI, the defendant was sentenced to

2

Millennium, and Dynetta Woods, his wife, as the secretary of the company. Millennium provided personal care services, with the majority of its business involving services billed to Medicaid. Between 2006 and 2010, Millennium billed Medicaid approximately $7,000,000.00.

Terry Cooper, R.N., had worked for the Louisiana Department of Health and Hospitals (DHH) since 1984. In 2006, she was the RN manager over nursing homes and immediate care facilities for the developmentally disabled, as well as home and community based services. She indicated that in 2005, the legislature transferred licensing authority for home and community based programs to DHH, which already controlled Medicaid enrollment. She testified that in November of 2006, DHH promulgated a rule requiring direct service workers to be trained in cardiopulmonary resuscitation (CPR) and basic first aid within forty-five days of hire. In 2012, the requirement was removed from DHH regulations. According to Cooper, providing DHH with a fake CPR card as proof of training would constitute fraud.

Pamela Moseley worked in program integrity/Medicaid fraud and health standards prior to her retirement from DHH in 2011. She acknowledged that in 2006, direct service workers were required to have CPR training. DHH would check for compliance with the CPR training requirement by examining the personnel files of direct service workers to determine whether they contained an original or a photocopy of a CPR card.

Melissa Landrum Rohner testified at trial. In August of 2009, she had planned to work for Extended Family, a personal care assistance program operated by Stacy Baptiste. However, Baptiste "[pled] out for Medicaid fraud" and shut down the business. Baptiste referred Rohner to Dynetta and Dwaine Woods.

---

pay a fine of $10,000.00. When there is a discrepancy between the minutes and the transcript, the transcript must prevail. **Lynch**, 441 So.2d at 734.

Thereafter, Rohner was hired as a regional director for Millennium. Some of the former clients of Extended Family transferred to Millennium.

Rohner identified a copy of a CPR First Aid card with her name on it. Dwaine Woods had given her the original CPR First Aid card. The card indicated Rohner had received CPR First Aid training on October 13, 2009. Rohner testified she had not received CPR First Aid training on October 13, 2009. Rohner told Dwaine Woods that she "did not take this class" when he handed her the card. He told her "the card was for [her]."

Dwaine Woods also gave Rohner CPR First Aid cards for other employees of Millennium and instructed her to make copies of the cards, distribute the originals to the employees, and file the copies in their files. In addition to the false statement concerning her own CPR First Aid training, due to her familiarity with another employee's time sheets, Rohner was also aware of at least one other CPR First Aid card that falsely indicated the employee had received training. Because of her past experience at Extended Family, Rohner was concerned about getting "wrapped up" in any dishonest activity. When she noticed "things that started to not make sense" in regard to billing, she emailed Dwaine Woods, specifically advising him that "things were getting billed for hours that people were not working." Rohner emailed rather than telephoned because Dwaine and Dynetta Woods were on a cruise, and Rohner did not think she would be able to contact Dwaine Woods by telephone.

According to Rohner, during the last week of November 2009, Dwaine Woods called her. Rohner told Dwaine Woods "what [was] going on." Based on the tone of Dwaine Woods' voice and the way he responded to her, Rohner realized he "had something to do with [the irregularities]." Approximately one hour later, another employee of Millennium seized Rohner's computer and removed it from her office. Rohner gathered her belongings and left Millennium.

4

Rohner subsequently notified the Medicaid fraud department at DHH, the company that billed for Medicaid, and Louis Hicks with the American Red Cross, that there were a "multitude" of American Red Cross CPR First Aid cards that had been given out to employees even though they had not attended the CPR First Aid training classes. Rohner admitted she was arrested on January 10, 2010, and convicted on July 8, 2010, for possession of crystal methamphetamine.

Jamaal Ellis Fletcher testified at trial. He was Dynetta Woods' cousin and had "been knowing her just about all [his] life." Additionally, Dynetta Woods' brother, Regis Hadrick, was Fletcher's business partner, former roommate, and one of his best friends. Fletcher also knew Dwaine Woods. Prior to trial, Fletcher pled guilty to conspiracy to commit forgery. According to Fletcher, he conspired with Millennium, Dynetta Woods, and Dwaine Woods to create false CPR cards.

Fletcher indicated that between August and December of 2009, Millennium was a personal care service, and "around that time," he was certified by the Red Cross as a CPR/First Aid Instructor. Fletcher had previously been paid for teaching Red Cross training classes that he had not actually taught.

Fletcher was unaware of the exact date, but in approximately October of 2009, he was contacted by Dynetta Woods. She told him she needed some cards "done," and "needed them done fast." Dynetta Woods told Fletcher she would fax the names to him, and he subsequently received a fax from Millennium with a list of the names for the CPR cards. She made no inquiry about Fletcher's availability to teach the CPR class. Fletcher stated, "I know [the Red Cross] wanted the class to be taught. I chose not to teach it." Fletcher did not agree, however, that Dynetta Woods wanted the class to be taught. He indicated, while she did not specifically instruct him to "forge CPR cards and provide them to Millennium[,]" that is what was "perfectly understood[.]" Fletcher testified he "might have asked for the names," but he did not know who worked at Millennium and would not have

5

known which names to put on the CPR cards unless they were provided to him. Fletcher wrote up the CPR cards and submitted them to the Red Cross.

In December of 2009, Louis Hicks of the Red Cross called Fletcher. Hicks either told Fletcher that the cards "weren't right," or that Fletcher had not taught the class and someone had "called in on it." Fletcher called Dynetta Woods and told her about the call, stating that "[the Red Cross] caught up with it" or "[the Red Cross] caught us." Less than ten minutes later, Dwaine Woods called Fletcher. Fletcher testified, "[Dwaine Woods] wanted to know what was going on and I let him know." Dwaine Woods told Fletcher, "don't worry about [it]. He was going to handle it." Dwaine Woods also told Fletcher to tell Hicks that Fletcher had in fact taught the class.

Thereafter, Fletcher went to the Red Cross and talked to Hicks. In accordance with Dwaine Woods' instructions, Fletcher lied to Hicks and told him that he had taught the class referenced in the CPR cards. Hicks started talking about the Attorney General, and Fletcher wondered, "What am I in to." He told Hicks, "I don't know what [the defendants] got me into."

At trial, Fletcher identified his signature on Red Cross CPR cards indicating he had trained Yvette Ferguson, Jeana Cooper, and Falin Carter in CPR on either October 13, 2009 or October 14, 2009. Fletcher had not in fact provided the training. Additionally, he identified an August 15, 2009 check for $300 made out to him and signed by Dynetta Woods for CPR/First Aid. He also identified a November 5, 2009 check for $1,125 made out to him from Millennium and signed by Dynetta Woods for First Aid/CPR. Fletcher indicated the check was payment for the October 13, 2009 and October 14, 2009 classes that he did not teach. Fletcher indicated he was paid $25 per person upon delivery of the fake CPR cards.

Randy Henagan, a criminal investigator with the Louisiana Department of Justice, Attorney General's Office, Medicaid Fraud Control Unit, testified at trial.

He reviewed Fletcher's AT&T phone records for the period between August of 2009 and September of 2010. In both August and September of 2009, Fletcher's telephone was used to call Millennium three times. In October of 2009, Fletcher's telephone was used to call Millennium one time. No calls were made from Fletcher's telephone to Millennium in November and December of 2009.

Fletcher's telephone was used to call Dynetta Woods' cellphone one time in August of 2009. No additional calls were made from Fletcher's telephone to her cellphone in September and October of 2009. Fletcher's telephone was used to call Dynetta Woods' cellphone three times in November of 2009 and twelve times in December of 2009. Henagan did not know what was discussed in the telephone calls.

Dwaine Woods testified at trial. He was aware that in 2006 and 2009, CPR training was a mandatory requirement for direct service workers who came into contact with a client. He claimed, every quarter, the training coordinator at each of Millennium's locations would direct the staff of each office to audit the charts to determine if there were any employees that needed CPR renewals or initial certification. According to Dwaine Woods, if any employees needed CPR training, the staff would generate a list of names and the training coordinator would schedule a class. Thereafter, an instructor would come, provide the training for the employees, and they would "get certified."

Nicole Skidmore was the training coordinator for the Baton Rouge and Denham Springs offices.[4] In mid-September of 2009, however, Skidmore was out of the office on sick leave. Dwaine Woods claimed he instructed the directors of the Baton Rouge and Denham Springs offices to "[ensure] that all of the trainings were completed." Yolanda Grisby was the director of the Baton Rouge office and Rohner was the director of the Denham Springs office.

According to Dwaine Woods, he first learned of a problem with the CPR cards on November 20, 2009, when Skidmore informed him that she had been contacted by an employee who questioned why her card had not been signed by the instructor. Dwaine Woods claimed Rohner was present, and he asked her if she had allowed the employee to take the class on-line. Dwaine Woods claimed, at the time, he had been meeting with Rohner to give her a verbal warning concerning her drug use. He claimed he told her he would rather get her some help than fire her. Dwaine Woods claimed he was preparing to go out of town for a week, so he told Skidmore and Rohner he would "see what was going on with the CPR cards" when he returned.

Dwaine Woods claimed Rohner left him voice mails while he was on his trip, and when he called back, she "had left the office." He denied talking to Rohner after his trip. In a letter to Congressman Charlie Melancon, Dwaine Woods claimed Rohner quit on November 24, 2009, "after several discussions concerning her performance and possible drug use." In the letter, Dwaine Woods also claimed the allegations against him were "based on information from a disgruntled employee who has since been arrested on drug charges."

Dwaine Woods stated when he returned from his trip, he tried to talk to Louis Hicks with the American Red Cross, but he was unavailable. Woods did, however, contact Hicks the next day and, pursuant to his instructions, gave him a letter describing what had happened. Dwaine Woods claimed "we" paid Fletcher because we thought he had taught the class. Dwaine Woods denied participating or conspiring with Fletcher to forge CPR cards. Dwaine Woods denied that Dynetta Woods ever told him that the CPR cards were "fraudulently done" by Fletcher. Dwaine Woods also denied that Dynetta Woods ever asked him to tell Fletcher to tell Hicks that Fletcher had "done the training." When asked if he and

---

[4] Millennium also had an office in Lafayette.

Dynetta Woods had discussed the fake CPR cards issued by Fletcher, Dwaine Woods answered, "It was my company, something was going on, that's my wife, we talked."

Dwaine Woods claimed Hicks told him that the cards were invalid and that he needed to retrieve them. Dwaine Woods claimed he retrieved the cards, returned them to Hicks, scheduled another class for the employees and "made sure that everyone was there." Dwaine Woods claimed his investigation of the incident revealed that of the 19 employees with invalid CPR cards, approximately 13 of them did not need CPR cards. Dwaine Woods claimed 11 of the employees already had CPR cards, and several employees "didn't even work with our company anymore," and thus, "[did not need] to have the certification." He denied telling Fletcher to lie to Hicks that Fletcher had performed the CPR training.

Dwaine Woods identified State Exhibit #23 as a list of the Millennium employees that were scheduled for First Aid CPR training on December 18, 2009 because Fletcher did not teach them on October 13 and 14, 2009. Woods gave the list to the American Red Cross. He agreed the names matched the initials in counts II-XX of the indictment.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number 1, the defendant argues it is a "judicial" entity and unable to generate the requisite intent necessary to substantiate a guilty verdict in this matter. The defendant also adopts the arguments of Dynetta and Dwaine Woods on sufficiency of the evidence.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

9

reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Eason**, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 69-70.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Eason**, 293 So.3d at 69-70.

The due process standard of **Jackson** "does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict." **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 422 (*per curiam*). In cases of circumstantial evidence, the **Jackson** standard means that when a jury "reasonably rejects the hypothesis of innocence presented by the [defense], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." **State v. Captville**, 448 So.2d 676, 680 (La. 1984). Nevertheless, the **Jackson** standard does not permit jurors "'to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" **State v. Mussall**, 523 So.2d 1305, 1311 (La. 1988) (quoting 2 C. Wright, Federal Practice & Procedure, Criminal 2d § 467 at 660-61 and n.23 (2d ed.

10

1982)). See **State v. Jones**, 2016-1502 (La. 1/3/18), ___ So.3d ___, ___, 2018 WL 618433, *3 (*per curiam*).

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. However, the defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. **State v. Neal**, 2000-0674 (La. 6/29/01), 796 So.2d 649, 659, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." **State v. Anderson**, 97-1301 (La. 2/6/98), 707 So.2d 1223, 1225 (*per curiam*) (quoting 2 W. LaFave, A. Scott, Substantive Criminal Law, § 6.7, p. 138 (West 1996)); **State v. Clay**, 2011-1974 (La. App. 1st Cir. 5/3/12) (*unpublished*), 2012 WL 1564626, at *2, writ denied, 2013-0287 (La. 6/14/13), 118 So.3d 1084.

An individual is a criminal conspirator if he makes an agreement with one or more persons for the specific purpose of committing any crime and at least one of the parties does an act in furtherance of the object of the agreement. La. R.S. 14:26(A). The elements of conspiracy may be proven by direct or circumstantial evidence. **State v. Belino**, 96-0789 (La. App. 1st Cir. 12/20/96), 686 So.2d 101, 103, writ denied, 98-2992 (La. 6/25/99), 745 So.2d 625.

It is unlawful to forge, with intent to defraud, any signature to, or any part of, any writing purporting to have legal efficacy. La. R.S. 14:72(A). Issuing,

transferring, or possessing with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute a violation of La. R.S. 14:72. La. R.S. 14:72(B).

Knowledge, like intent, must often be inferred from the totality of the circumstances of the transaction where it is an element of the crime charged. The test of knowledge is not a subjective test, but rather a completely objective test, *i.e.*, the offender is taken to know that which any reasonable person so situated would have known. An intent to defraud is also an essential element of the offense of forgery. The criminal intent required for forgery is the intent to defraud any person, and it suffices if the forged instrument has prejudiced or might prejudice the rights of another. An intent to profit by the act is not a necessary element of the case. Moreover, specific intent is a state of mind and need not be proved as a fact but may be inferred from the circumstances and transactions of the case. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. **State v. Dufrene**, 2017-1496 (La. App. 1st Cir. 6/4/18), 251 So.3d 1114, 1119, writ granted in part on other grounds and remanded, 2018-1174 (La. 5/28/19), 273 So.3d 301 (*per curiam*).

As defined in La. R.S. 14:67(A), theft consists of the following elements: (1) the misappropriation or taking of anything of value, (2) which belongs to another, (3) without consent or by means of fraudulent conduct, practices, or representations, and (4) with the intent to permanently deprive the other of the object of the misappropriation or taking. Theft is a specific intent crime. Specific intent may be inferred from the circumstances of a transaction and from the actions of the accused. Further, specific intent is an ultimate legal conclusion to be

12

resolved by the fact finder. **State v. Fisher**, 2013-1152 (La. App. 1st Cir. 6/6/14) (*unpublished*), 2014 WL 3765945, *4. The gist of theft by fraudulent conduct or misrepresentations is a misappropriation or the taking of money by fraudulent conduct or representations. "Fraudulent conduct" is a conclusion of law. See **State v. Heymann**, 256 La. 18, 24, 235 So.2d 78, 80 (1970).

Criminal liability in our system of justice has always been founded upon the simultaneous existence of two distinct elements namely: (1) *actus reus*, and (2) *mens rea*. The existence of only one of these elements does not make one criminally liable. Both must be present to invoke the sanctions society has placed on what is termed "criminal conduct." Certainly one cannot be held criminally liable for simply thinking of a criminal act without the act occurring. See La. R.S. 14:8 and comments, La. R.S. 14:27. A somewhat more difficult, but logically consistent idea, is that an act, committed without the required criminal intent or mens rea, is not criminally punishable. We do not criminally punish those that do not know what they are doing - such as the insane. Neither do we punish those who, while aware of what they are doing, have no control over their actions - the victims of threats or coercion. We do not impose criminal liability on those who act without criminal intent for the simple reason that such an imposition would not achieve the main goal of our criminal law: deterrence. **State v. Chapman Dodge Center, Inc.**, 428 So.2d 413, 417 (La. 1983).

When a corporation is accused of committing a crime which requires intent, it must be determined who within the corporate structure had the intent to commit the crime. If the crime was the product of a board of directors' resolution authorizing its employees to commit specific criminal acts, then intent on the part of the corporation is manifest. However, a more difficult question arises if the crime is actually committed by an employee of the corporation not authorized to perform such an act. Holding a corporation criminally responsible for the acts of

an employee may be inconsistent with basic notions of criminal intent, since such a posture would render a corporate entity responsible for actions which it theoretically had no intent to commit. *Id.*

In the instant case, Millennium was a business founded by Dwaine Woods. Dwaine Woods was designated as the president of Millennium. Dynetta Woods was designated as the secretary of the company. Donald Joseph Triggs, Jr., was listed as a Millennium board member.[5] He was not charged with any crime involving the defendant.

Dwaine Woods was found not guilty on counts I-XX, but found guilty on count XXI. Following appeal, however, this court reversed that conviction. See **State v. Woods**, 2019-1142 (La. App. 1st Cir. 6/16/21), ___ So.3d ___. Accordingly, there is no guilt, and thus, no proof of intent on the part of Dwaine Woods, which can be imputed to Millennium in regard to counts I-XXI.

Dynetta Woods was found guilty as charged on counts I-XX. She was not charged in count XXI. There is, however, no proof that Dwaine Woods or the board of directors of Millennium authorized the criminal conduct of Dynetta Woods. Indeed, to the contrary, the jury specifically found Dwaine Woods not guilty of all counts involving Dynetta Woods. There was no complicity by the officers or the board of directors, explicit or tacit, in the criminal conduct of Dynetta Woods. Therefore, the actions of Dynetta Woods were insufficient to cause Millennium to be guilty of counts I-XX. See **Chapman Dodge Center, Inc.**, 428 So.2d at 420.

For the foregoing reasons, under the circumstances of this case, there was

---

[5] Triggs gave Dwaine Woods permission to use his name as a Millennium board member. Triggs testified he was initially listed as president. He indicated, however, even if he felt Dwaine Woods was not doing a good job, he did not have the authority to fire him as the administrator of Millennium. Triggs claimed, as president, he assumed he would have the authority to fire Dwaine Woods.

insufficient intent shown in the trial court to withstand a **Jackson v. Virginia** analysis, and therefore, this company defendant may not be found criminally responsible on counts I-XXI.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first assess the sufficiency of the evidence, see **State v. Hearold**, 603 So.2d 731, 734 (La. 1992), because the accused may therefore be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). The defendant here is so entitled. See generally **State v. Corkern**, 593 So.2d 1259, 1260 (La. 1992) (*per curiam*) (When the state's evidence merely invites the jury to speculate on a number of reasonable probabilities, some consistent with guilt, others consistent of innocence, a reasonable jury must entertain a reasonable doubt of the defendant's guilt.). Accordingly, for the reasons assigned, the defendant's convictions and sentences are reversed and a judgment of acquittal is entered in its favor. See **Jones**, 2018 WL 618433 at *3.

## CONCLUSION

For all of the above and foregoing reasons, the convictions and sentences of Millennium Health Care Services, LLC, d/b/a Millennium PCA Service are reversed and a judgment of acquittal is entered in its favor.

**CONVICTIONS AND SENTENCES REVERSED; JUDGMENT OF ACQUITTAL ENTERED.**

15