# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# NO. 2019 KA 1141

# STATE OF LOUISIANA

# VERSUS

# DYNETTA HADRICK WOODS

Judgment Rendered: **JUN 0 4 2021**

\* \* \* \* \*

On Appeal from the
19th Judicial District Court
Parish of East Baton Rouge, State of Louisiana
No. 02-12-0330

The Honorable Bruce Bennett, Judge Presiding

\* \* \* \* \*

Jeff Landry
*Louisiana Attorney General*
Tasha K. Stockwell
*Assistant Attorney General*
Baton Rouge, Louisiana

Attorneys for the State of Louisiana

A. Gregory Rome
Baton Rouge, Louisiana
and
La'Deisha Woods
Port Allen, Louisiana

Attorneys for Defendant-Appellant,
Dynetta Hadrick Woods

\* \* \* \* \*

BEFORE: THERIOT, WOLFE, AND HESTER, JJ.

Hester, J. concurs

**WOLFE, J.**

The defendant, Dynetta Hadrick Woods, was charged by grand jury indictment with one count of conspiracy to commit forgery (count I), a violation of La. R.S. 14:26 & 14:72; and nineteen counts of forgery (counts II – XX), violations of La. R.S. 14:72.[1] Following a jury trial, she was found guilty as charged on all counts. On count I, she was sentenced to five years at hard labor and fined $2500. On counts II – XX, she was sentenced on each count, to five years at hard labor and fined $2500, with the sentences to run concurrently with each other, but consecutively to count I. All sentences were suspended and she was placed on supervised probation for five years subject to payment of $54,729.72 restitution. Following a hearing, the court found the defendant to be indigent.[2] Thereafter, following another hearing, the court modified the restitution obligation by ordering the defendant to pay $10,000 restitution for the expenses of prosecution by the Attorney General's Office[3] and zero restitution to the Louisiana Department of Health and Hospitals (DHH). The State moved for reconsideration of sentence, but the motion was denied. The defendant now appeals challenging the sufficiency of the evidence, claiming the trial court failed to review the record before denying post-trial motions and imposing sentence, and challenging the record as incomplete for review. The State appeals challenging the modification of restitution. See La. Code Crim. P. art. 881.2(B)(2). For the following reasons, we

---

[1]     Dwaine Joseph Woods, Sr., and Millennium L.L.C. were charged by the same indictment with the same offenses and an additional count of theft (value over $500). Dwaine Woods and Millennium separately appealed from their convictions. See **State v. Woods**, 2019-1142 (La. App. 1st Cir. __/__/__), ___ So.3d ___, and **State v. Millennium Health Care Services, LLC, d/b/a Millennium PCA Services**, 2019-1143 (La. App. 1st Cir. __/__/__), ___ So.3d ___.

[2]     On August 3, 2017, the defendant filed a combined motion to terminate restitution and to be declared indigent. Judge White denied the motion on August 24, 2017. Thereafter, at a December 12, 2018 status hearing, defense counsel argued indigency can be raised at any stage and a formal motion was not needed. Judge Bennett agreed, and defense counsel made an oral motion for the defendant to be found indigent. Subsequently, the trial court declared it was limiting the December 12, 2018 hearing "to the issues of indigency for both defendants [Dynetta and Dwaine]."

[3]     See La. Code Crim. P. art. 887(A) ("[a] defendant who is convicted of an offense ... shall be liable for all costs of the prosecution").

affirm the convictions, affirm the sentences in part, and vacate the modification of restitution.

## FACTS

In 2004, Dwaine Joseph Woods, Sr., founded Millennium Health Care Services (Millennium), which did business as Millennium PCA (personal care assistance) Services, LLC. He listed himself as the president of Millennium, and the defendant, his wife, as the secretary of the company. Millennium provided personal care services, with the majority of its business involving services billed to Medicaid. Between 2006 and 2010, Millennium billed Medicaid approximately $7,000,000.

Terry Cooper, an R.N. for DHH since 1984, testified during the trial. In 2006, she was the R.N. manager over nursing homes and immediate care facilities for the developmentally disabled, as well as home and community based services. She indicated that in 2005, the legislature transferred licensing authority for home and community based programs to DHH, which already controlled Medicaid enrollment. She testified that in November of 2006, DHH promulgated a rule requiring direct service workers to be trained in cardiopulmonary resuscitation (CPR) and basic first aid within forty-five days of hire. Cooper said that in 2012, the requirement was removed from DHH regulations. According to Cooper, it would be fraud to give DHH a fake CPR card as proof of training.

Pamela Moseley, who worked in program integrity/Medicaid fraud and health standards prior to her retirement from DHH in 2011, also testified at the trial. She acknowledged that in 2006, direct service workers were required to have CPR training. DHH would check for compliance with the CPR training requirement by examining the personnel files of direct service workers to see if they contained an original or a photocopy of a CPR card.

Melissa Landrum Rohner testified at trial. In August of 2009, she had planned to work for Extended Family, a personal care assistance program operated by Stacy

3

Baptiste. However, Baptiste "[pled] out for Medicaid fraud" and shut down the business. Baptiste referred Rohner to the defendant and Dwaine Woods. Thereafter, Rohner was hired as a regional director for Millennium. Some of the former clients of Extended Family transferred to Millennium.

Rohner identified a copy of a CPR First Aid card with her name on it. According to Rohner, Dwaine Woods gave her the original CPR First Aid card. The card indicated Rohner received CPR First Aid training on October 13, 2009. Rohner testified she did not receive CPR First Aid training on October 13, 2009. Rohner told Dwaine Woods that she "did not take this class" when he handed her the card. He told her "the card was for [her]."

Dwaine Woods also gave Rohner CPR First Aid cards for other employees of Millennium and instructed her to make copies of the cards, distribute the originals to the employees, and file the copies in their files. Due to her familiarity with another employee's time sheets, Rohner was also aware of at least one other CPR First Aid card that was issued to an employee who had not received training. Because of her past experience at Extended Family, Rohner was concerned about getting "wrapped up" in any dishonest activity. When she noticed "things that started to not make sense" in regard to billing, she emailed Dwaine Woods, specifically advising him that "things were getting billed for hours that people were not working." Rohner emailed rather than telephoned because Dwaine Woods and the defendant were on a cruise, and Rohner did not think she would be able to contact him by telephone.

According to Rohner, during the last week of November 2009, Dwaine Woods called her. Rohner told Dwaine Woods "what [was] going on." Based on the tone of Dwaine Woods' voice and the way he responded to her, Rohner realized he "had something to do with [the irregularities]." Approximately one hour later, another employee of Millennium seized Rohner's computer and removed it from her office. Rohner gathered her belongings and left Millennium.

4

Rohner subsequently notified the Medicaid fraud department at DHH, the company that billed for Medicaid, and Louis Hicks with the American Red Cross, that there were a "multitude" of American Red Cross CPR First Aid cards that had been given out to employees even though they had not attended the CPR First Aid classes. Rohner admitted she was arrested on January 10, 2010, and convicted on July 8, 2010, for possession of crystal methamphetamine.

Jamaal Ellis Fletcher testified at trial. He was the defendant's cousin and had "been knowing her just about all [his] life." Additionally, the defendant's brother, Regis Hadrick, was Fletcher's business partner, former roommate, and one of his best friends. Fletcher also knew Dwaine Woods. Prior to trial, Fletcher pled guilty to conspiracy to commit forgery. According to Fletcher, he conspired with Millennium, the defendant, and Dwaine Woods to create false CPR cards.

Fletcher indicated that between August of 2009 and December of 2009, Millennium was a personal care service, and "around that time," he was certified by the Red Cross as a CPR/First Aid instructor. Fletcher had previously been paid for teaching Red Cross training classes that he had not actually taught.

Fletcher was unaware of the exact date, but in approximately October of 2009, he was contacted by the defendant. She told him she needed some cards "done" and "needed them done fast." The defendant told Fletcher she would fax the names to him, and he subsequently received a fax from Millennium with a list of the names for the CPR cards. The defendant made no inquiry about Fletcher's availability to teach the CPR class. Fletcher stated, "I know [the Red Cross] wanted the class to be taught. I chose not to teach it." Fletcher did not agree, however, that the defendant wanted the class to be taught. He indicated, while the defendant did not specifically instruct him to "forge CPR cards and provide them to Millennium[,]" that is what was "perfectly understood[.]" Fletcher testified he "might have asked for the names," but he did not know who worked at Millennium and would not have known which names to put on

5

the CPR cards unless they were provided to him. Fletcher wrote up the CPR cards and submitted them to the Red Cross.

In December of 2009, Louis Hicks of the Red Cross called Fletcher. Fletcher could not remember the exact phrasing but testified that Hicks either told Fletcher that the cards "weren't right," or that Fletcher did not teach the class and someone had "called in on it." Fletcher called the defendant and told her about the call, stating that "[the Red Cross] caught up with it" or "[the Red Cross] caught us." Less than ten minutes later, Dwaine Woods called Fletcher. Fletcher testified, "[Dwaine Woods] wanted to know what was going on and I let him know." Dwaine Woods told Fletcher, "don't worry about [it]. He was going to handle it." Dwaine Woods also told Fletcher to tell Hicks that Fletcher had in fact taught the class.

Thereafter, Fletcher went to the Red Cross and talked to Hicks. In accordance with Dwaine Woods' instructions, Fletcher lied to Hicks and told him that he taught the class referenced in the CPR cards. Hicks started talking about the Attorney General, and Fletcher wondered, "What am I in to." He told Hicks, "I don't know what [the defendants] got me into."

At trial, Fletcher identified his signature on Red Cross CPR cards indicating he had trained Yvette Ferguson, Jeana Cooper, and Falin Carter in CPR on either October 13, 2009 or October 14, 2009. Fletcher acknowledged that he did not provide the training. Additionally, he identified an August 15, 2009 check for $300 made out to him and signed by the defendant for CPR/First Aid. He also identified a November 5, 2009 check for $1,125 made out to him from Millennium and signed by the defendant for First Aid/CPR. Fletcher indicated the checks were payment for the October 13, 2009 and October 14, 2009 classes that he did not teach. Fletcher indicated he was paid $25 per person upon delivery of the fake CPR cards.

Randy Henagan, a criminal investigator with the Louisiana Department of Justice, Attorney General's Office, Medicaid Fraud Control Unit, testified at trial. He

6

reviewed Fletcher's AT&T phone records for the period between August of 2009 and September of 2010. In both August and September of 2009, Fletcher's telephone was used to call Millennium three times. In October of 2009, Fletcher's telephone was used to call Millennium one time. No calls were made from Fletcher's telephone to Millennium in November and December of 2009.

Fletcher's telephone was used to call the defendant's cellphone one time in August of 2009. No additional calls were made from Fletcher's telephone to the defendant's cellphone in September and October of 2009. Fletcher's telephone was used to call the defendant's cellphone three times in November of 2009 and twelve times in December of 2009. Henagan did not know what Fletcher talked about in the telephone calls.

Dwaine Woods testified at trial. He was aware that in 2006 and 2009, CPR training was a mandatory requirement for direct service workers who came into contact with a consumer. He claimed, every quarter, the training coordinator at each of Millennium's locations would direct the staff of each office to audit the charts to determine if there were any employees that needed CPR renewals or initial certification. According to Dwaine Woods, if any employees needed CPR training, the staff would generate a list of names and the training coordinator would schedule a class. Thereafter, an instructor would come, provide the training for the employees, and they would "get certified."

Nicole Skidmore was the training coordinator for the Baton Rouge and Denham Springs offices.[4] In mid-September 2009, Skidmore was out of the office on sick leave. Dwaine Woods said that he instructed Yolanda Grisby, the director of the Baton Rouge and Denham Springs offices, and Rohner to "[ensure] that all of the trainings were completed."

---

[4]     Millennium also had an office in Lafayette.

According to Dwaine Woods, he first learned of a problem with the CPR cards on November 20, 2009, when Skidmore informed him that she had been contacted by an employee who questioned why her card had not been signed by the instructor. Dwaine Woods claimed Rohner was present, and he asked her if she had allowed the employee to take the class online. Dwaine Woods said, at the time, he had been meeting with Rohner to give her a verbal warning concerning her drug use. He said he told her he would rather get her some help than fire her. Dwaine Woods claimed he was preparing to go out of town for a week, so he told Skidmore and Rohner he would "see what was going on with the CPR cards" when he returned.

Dwaine Woods claimed Rohner left him voicemails while he was on his trip, and when he called back, she "had left the office." He denied talking to Rohner after his trip. In a letter to Congressman Charlie Melancon, Dwaine Woods claimed Rohner quit on November 24, 2009, "after several discussions concerning her performance and possible drug use." In the letter, Dwaine Woods also claimed the allegations against him were "based on information from a disgruntled employee who has since been arrested on drug charges."

Dwaine Woods stated when he returned from his trip, he tried to talk to Louis Hicks with the American Red Cross, but he was unavailable. Woods did, however, contact Hicks the next day and, pursuant to his instructions, gave him a letter describing what had happened. Dwaine Woods claimed "we" paid Fletcher because we thought he had taught the class. Dwaine Woods denied participating or conspiring with Fletcher to forge CPR cards. Dwaine Woods denied that the defendant ever told him that the CPR cards were "fraudulently done" by Fletcher. Dwaine Woods also denied that the defendant ever asked him to tell Fletcher to tell Hicks that Fletcher had "done the training." When asked if he and the defendant had discussed the fake CPR cards issued by Fletcher, Dwaine Woods answered, "It was my company, something was going on, that's my wife, we talked."

Dwaine Woods claimed Hicks told him that the cards were invalid and that he needed to retrieve them. Dwaine Woods claimed he retrieved the cards, returned them to Hicks, scheduled another class for the employees and "made sure that everyone was there." Dwaine Woods claimed his investigation of the incident revealed that of the 19 employees with invalid CPR cards, approximately 13 of them did not need CPR cards. Dwaine Woods claimed 11 of the employees already had CPR cards, and several employees "didn't even work with our company anymore," and thus, "[did not need] to have the certification." He denied telling Fletcher to lie to Hicks that Fletcher had performed the CPR training.

Dwaine Woods identified State Exhibit #23 as a list of the Millennium employees that were scheduled for First Aid CPR training on December 18, 2009 because Fletcher did not teach them on October 13 and 14, 2009. Woods gave the list to the American Red Cross. He agreed the names matched the initials in counts II-XX of the indictment.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number 1, the defendant argues the State used "incomplete AT&T records to connect [the defendant] to the crime." Additionally, the defendant argues Jamaal Fletcher "directly and unequivocally declared that [the defendant] did not ask him to forge CPR cards and decided to forge the cards because he was asked to get the cards fast." The defendant claims "[i]t is absurd to accept that Millennium would hire and pay Fletcher full price for a service, with no intention to receive that service. It is especially ridiculous given the fact that this act would not produce benefit for [the defendant] or the company."

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

9

have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Eason**, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 69.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Eason**, 293 So.3d at 69-70.

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. However, the defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. **State v. Neal**, 2000-0674 (La. 6/29/01), 796 So.2d 649, 659, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's

10

intention." **State v. Anderson**, 97-1301 (La. 2/6/98), 707 So.2d 1223, 1225 (*per curiam*) (quoting 2 W. LaFave, A. Scott, Substantive Criminal Law, § 6.7, p. 138 (West 1996)); **State v. Clay**, 2011-1974 (La. App. 1st Cir. 5/3/12), 2012 WL 1564626, *2, writ denied, 2013-0287 (La. 6/14/13), 118 So.3d 1084.

An individual is a criminal conspirator if he makes an agreement with one or more persons for the specific purpose of committing any crime and at least one of the parties does an act in furtherance of the object of the agreement. La. R.S. 14:26(A). The elements of conspiracy may be proven by direct or circumstantial evidence. **State v. Belino**, 96-0789 (La. App. 1st Cir. 12/20/96), 686 So.2d 101, 104, writ denied, 98-2992 (La. 6/25/99), 745 So.2d 625.

It is unlawful to forge, with intent to defraud, any signature to, or any part of, any writing purporting to have legal efficacy. La. R.S. 14:72(A). Issuing, transferring, or possessing with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute a violation of La. R.S. 14:72. La. R.S. 14:72(B).

Knowledge, like intent, must often be inferred from the totality of the circumstances of the transaction where it is an element of the crime charged. The test of knowledge is not a subjective test, but rather a completely objective test, i.e. the offender is taken to know that which any reasonable person so situated would have known. An intent to defraud is also an essential element of the offense of forgery. The criminal intent required for forgery is the intent to defraud any person, and it suffices if the forged instrument has prejudiced or might prejudice the rights of another. An intent to profit by the act is not a necessary element of the case. Moreover, specific intent is a state of mind and need not be proved as a fact but may be inferred from the circumstances and transactions of the case. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. The existence of specific intent is an ultimate

11

legal conclusion to be resolved by the trier of fact. **State v. Dufrene**, 2017-1496 (La. App. 1st Cir. 6/4/18), 251 So.3d 1114, 1119, writ granted in part on other grounds and remanded, 2018-1174 (La. 5/28/19), 273 So.3d 301 (*per curiam*).

Herein, any rational trier of fact viewing the evidence in the light most favorable to the State could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of conspiracy to commit forgery and the defendant's identity as the perpetrator of those offenses. The verdict returned in this matter on count I indicates the jury accepted the testimony of Fletcher and the other State witnesses that the defendant and Fletcher agreed to forge nineteen American Red Cross CPR cards. Although the State presented testimony from Henagan that calls were made from Fletcher's telephone to the defendant's cellphone in August, November, and December of 2009, the State's principal witness against the defendant was not Henagan, but rather, Fletcher. Further, the verdicts returned in this matter on counts II - XX indicate the jury accepted the testimony of Fletcher and the other State witnesses that the defendant was involved in the commission of the forgery of the nineteen CPR cards by procuring Fletcher to forge the CPR cards and by aiding and abetting in the commission of those offenses by directly or indirectly providing Fletcher with the names for the cards. Defrauding DHH was reasonably certain to result from the creation of the forged CPR cards. The defendant injured or prejudiced the rights of patients to be treated by direct service workers trained in CPR and injured or prejudiced the right of DHH to have direct service workers trained in CPR treating patients. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the

evidence to overturn a fact finder's determination of guilt. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. **Eason**, 293 So.3d at 70-71.

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Marston**, 2000-0589 (La. 3/16/01), 780 So.2d 1058, 1062 (*per curiam*); **State v. Winfrey**, 2012-0940 (La. App. 1st Cir. 2/15/13), 2013 WL 595671, *4, writ denied, 2013-0585 (La. 10/4/13), 122 So.3d 1014. No such hypothesis exists in the instant case. The verdicts returned in this matter reflect the reasonable rejection of the defendant's theory that Fletcher forged the CPR cards without the defendant's knowledge. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*); **Winfrey**, 2013 WL 595671 at *4. Further, in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (*per curiam*). We cannot say that the jury's determination was irrational under the facts and circumstances presented to it. See **Ordodi**, 946 So.2d at 662.

This assignment of error is without merit.

## FAILURE TO REVIEW THE RECORD

In assignment of error number 2,[5] the defendant argues the trial court failed to review the record before denying post-trial motions and imposing sentence.

Contrary to the claims of the defendant, the sentencing transcript reflects that Judge Bennett[6] made numerous references to the record prior to denying post-trial motions and imposing sentence. Judge Bennett stated "[a]fter a review of the pleadings, it appears that a new trial was, in fact, requested and denied by the court, on or about I think March 8, 2016." (Emphasis added.) Thereafter, Judge Bennett addressed Judge White's July 5, 2016 request for briefing, noting "It's my understanding from reviewing the record she asked [the State and the defense] to brief how long you could get an extension of time to apply for writs." (Emphasis added.) Additionally, in questioning the computation of restitution owed by Dwaine Woods, Judge Bennett specifically noted, "the record indicates ..." (Emphasis added.)

This assignment of error is without merit.

## INCOMPLETE RECORD

In assignment of error number 3,[7] citing **State v. Landry**, 97-0499 (La. 6/29/99), 751 So.2d 214, 215, the defendant argues her convictions and sentences[8] must be reversed because the record fails to contain transcripts of "key hearings"

---

[5] The defendant lists this assignment of error as assignment of error number 3, but argues the issue presented therein as her second assignment of error.

[6] Judge Trudy White presided over the defendant's jury trial, but the Louisiana Supreme Court appointed Judge Bruce Bennett to sit pro tempore over Judge White's division from November 14, 2016 to February 12, 2017. The defendant was sentenced during this period. Following the conclusion of Judge Bennett's appointment, Judge White resumed her seat. Additionally, on September 14, 2018, the Louisiana Supreme Court appointed Judge Bennett ad hoc to complete "unfinished business" relative to the trial proceedings in this matter.

[7] The defendant lists this assignment of error as assignment of error number 2, but argues the issue presented therein as her third assignment of error.

[8] The defendant incorrectly references her convictions and sentences as "Mr. Woods's conviction and sentence."

14

concerning a motion *in limine* filed in regard to Rohner's testimony and the motion for new trial.

**Landry** involved review of a conviction for first-degree murder resulting in the death penalty. **Landry**, 751 So.2d at 214. On appeal, the Louisiana Supreme Court noted loud construction noise had hindered recordation of the trial proceedings. **Id.** Additionally, the court inferred that the court reporter had experienced problems with the audio recording equipment which caused skips in the recordation of the trial proceedings. **Id.** The court found these problems deprived the defendant of his constitutionally guaranteed right of appeal and judicial review. See La. Const. art. I, §19 (right to judicial review); see also La. Code Crim. P. art. 843 (duty of court stenographer to record all of the proceedings); **Id.** at 215. Accordingly, the court reversed the conviction and sentence and remanded for a new trial. **Landry**, 751 So.2d at 216.

Thereafter, in **State v. Campbell**, 2006-0286 (La. 5/21/08), 983 So.2d 810, 872-73, cert. denied, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008), the Louisiana Supreme Court expounded on its holding in **Landry**, to-wit:

> In **Landry**, this Court reversed a conviction and death sentence because the appellate record was so deficient that the Court could not properly review the case for error. Even though this Court has found reversible error when material portions of the trial record were unavailable or incomplete, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a conviction. An incomplete record may be adequate for appellate review. A defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. (Citations omitted).

In the instant case, the minutes reflect that during trial on January 10, 2015, the State filed a motion *in limine* in reference to Rohner's testimony.[9] Defense counsel urged the court to deny the motion, but the court granted the motion. The defense

---

[9] This court ordered supplementation of the record with the transcript of *voir dire*, the transcript of opening statements, and the minutes of trial date January 10, 2015.

objected to the ruling of the court. The motion indicates the State was seeking to prevent leading questions or cross-examination of Rohner concerning "the removal of [her] minor children, domestic abuse issues with her husband ..., family court and confidential juvenile matters involving her children, a personal relationship with another man not her husband, and/or any other type of alleged criminal activity against [Rohner] for which she was neither arrested nor convicted, including but not necessarily limited to a suspected arson fire in Lafayette Parish, Louisiana[.]"

The record further indicates Rohner was fully examined concerning the defense's theory that her allegations against the defendant and Dwaine Woods resulted from Rohner's alleged drug problem and her being disciplined for that drug problem, rather than from any actual criminal activity by the defendants. The defendant fails to show how the granting of the motion *in limine* prejudiced her or how she is prejudiced by the absence of a transcript concerning the motion. Accordingly, the absence of a transcript concerning the motion *in limine* is an inconsequential omission from the record which is immaterial to a proper determination of this appeal.

On March 8, 2016, the defendant filed a motion for a new trial. She alleged that the verdict was contrary to the law and the evidence and that the court's ruling on a written motion (the denial of a bill of particulars) showed prejudicial error. See La. Code Crim. P. art. 851(B)(1) and (2). The minutes of March 16, 2016 indicate the motion was denied.[10] They also indicate that the defendant advised the court she would seek a supervisory writ from the ruling of the court. The court set a return date of May 10, 2016. On May 6, 2016, the defendant moved for an extension of time to seek supervisory relief from the ruling denying the motion for bill of particulars.

---

[10] The minutes of March 16, 2016 indicate the motion for new trial was filed and denied when the matter came before the court for sentencing. The motion, however, is stamped filed on March 8, 2016, and the order attached to the motion shows Judge White scheduled a hearing on the motion for July 5, 2016.

On July 5, 2016, the matter came before the court for motions. Judge White asked the State and the defense to brief certain issues, including "whether or not the motion for new trial is timely, motion for extension of time, you know, was timely[,]" before she ruled on the motion for extension of time to take writs. The court maintained August 16, 2016 as the sentencing date and stated it would "issue it's [sic] ruling, hopefully on that day and or give [the State and the defendants] an opportunity to argue on that day."

Effective November 14, 2016, Judge Bennett was assigned as Judge *Pro Tempore* to Judge White's section of court. The matter came before Judge Bennet for motions and sentencing on December 16, 2016. The defendant correctly notes that "[t]he record is void of any signed orders, minutes, or transcript of the August 16, 2016 hearing." This, however, is because the hearing scheduled for that date was actually held on December 16, 2016. The record contains a full transcript of the December 16, 2016 hearing.

This assignment of error is without merit.

## MODIFICATION OF RESTITUTION – PROCEDURAL BAR

In its first assignment of error, the State argues that the trial court abused its discretion in modifying the restitution amount because the defendant failed to file a timely motion to reconsider sentence following sentencing on December 16, 2016. The State agrees that an extension of time for Judge White to revisit the sentence imposed by Judge Bennett, if authorized by La. Code Crim. P. art. 881.1, is reasonable. The State does not agree, however, that allowing a trial judge to maintain jurisdiction for an indeterminate amount of time, *i.e.*, until an offender completes a sentence, is reasonable.

On December 16, 2016, the defendant was sentenced and ordered to pay $54,729.72 restitution. The court indicated it was "retaining jurisdiction" on the sentence under La. Code Crim. P. art. 881.1 "and that will leave, too, Judge White

the option of taking a look in the future, and I suspect that a lot of it will have to do with whether or not any restitution, or any efforts of restitution are made in the matter." The defendant did not make or file a motion to reconsider sentence. On August 3, 2017, she moved to terminate the probation condition of restitution and to be declared indigent.[11] On August 24, 2017, Judge White denied the motion. On February 9, 2018, the defendant filed a "motion to reurge request [for] a restitution hearing." On January 4, 2019, following a hearing, the court modified the restitution obligation by ordering the defendant to pay $10,000 restitution for the expenses of prosecution by the Attorney General's Office[12] and zero restitution to DHH.

A trial court may correct an illegal sentence at any time. La. Code Crim. P. art. 882(A); see also La. Code Crim. P. art. 881.5. Only those claims relating to the legality of the sentence itself under the applicable sentencing statutes may be raised in a motion to correct an illegal sentence. **State v. Gedric**, 99-1213 (La. App. 1st Cir. 6/3/99), 741 So.2d 849, 851-52 (*per curiam*), writ denied, 99-1830 (La. 11/5/99), 751 So.2d 239.

Even if the sentence is legal, the court "may amend or change the sentence, *within the legal limits of its discretion*, prior to the beginning of execution of the sentence." La. Code Crim. P. art. 881(A) (emphasis added). After commencement of execution of the sentence, "in felony cases in which the defendant has been sentenced to imprisonment *without hard labor and in misdemeanor cases*, the sentencing judge may reduce the sentence or may amend the sentence to place the defendant on supervised probation." La. Code Crim. P. art. 881(B)(1) (emphasis added); **Gedric**, 741 So.2d at 852.

---

[11] The defendant alleged she had not been provided a hearing "for this Honorable Court to determine a restitution amount, if any, [she] should have to pay through her probation." She argued "the current probation condition of restitution payments of $1,000.00 per month should be suspended immediately and a hearing should be held in front of this Honorable Court to determine a restitution amount, if any, is due to be paid."

[12] See footnote 3, *supra*.

For felony cases in which the defendant has been sentenced to imprisonment at hard labor (as in this case), there is no authorization for the court to amend the sentence after execution of the sentence has begun unless the court grants a timely filed motion to reconsider sentence. A motion to reconsider sentence must be filed within 30 days after imposition of sentence (unless the court at sentencing sets a longer time). La. Code Crim. P. art. 881.1(A)(1). An "out-of-time" motion to reconsider sentence is not contemplated by the Code of Criminal Procedure nor allowed by the jurisprudence. If the court grants a motion to reconsider sentence, it may resentence the defendant despite the pendency of an appeal or the commencement of execution of the sentence. La. Code Crim. P. art. 881.1(C); **Gedric**, 741 So.2d at 852.

Louisiana Code of Criminal Procedure article 822[13] does not purport to modify jurisprudential or statutory authority for consideration of a motion to reconsider sentence. The statutory framework, set out above, prevents a judge from becoming a "one man pardon board." **Id**.

Article 881.1 does not speak to the trial court's ability to "maintain jurisdiction." Rather, the article provides that in felony cases, the trial court may extend the period of time in which the state or a defendant may make or file a motion to reconsider sentence. See La. Code Crim. P. art. 881.1(A)(1); **State v. Lewis**, 2016-0533 (La. App. 1st Cir. 10/31/16), 207 So.3d 1078, 1081.

Louisiana Revised Statutes 15:566.2 provides that a sentence shall be considered as commencing on the day following the day on which a defendant is sentenced without regard to the date of incarceration in the state penitentiary. Louisiana Revised Statutes 15:566.2 is in Chapter 4, Execution of Sentence, whereas Article 881 falls under the sentencing provisions of Title 30. Article 881, if interpreted literally with La. R.S. 15:566.2, gives a defendant whose sentence is not

---

[13] Article 822 governs the procedure when "after the sentence is imposed, [the trial court] consider[s] amending or modifying the sentence imposed[.]"

stayed less than one day to have his sentence amended. Any other interpretation would mean that a sentence can be amended until the defendant started serving that particular sentence, creating numerous problems. **State v. Branch**, 96-1626 (La. App. 3rd Cir. 5/21/97), 696 So.2d 81, 84. Additionally, with the enactment of Article 881.1, a defendant has thirty days after sentencing to file a motion to reconsider sentence, and an illegal sentence can be corrected at any time pursuant to Article 882. Thus, a defendant is given sufficient time to convince the trial court to alter his sentence, without the need for a liberal interpretation of Article 881. **Id.**; see also **State v. Guajardo**, 428 So.2d 468, 470 (La. 1983) ("[t]he language of Article 881 itself indicates that the execution of a sentence does not commence with its imposition, since the article contemplates a period of time after its imposition during which the trial judge may amend the sentence. Furthermore, our law fixes the day after imposition as the point of commencement of a hard labor sentence.").

In the instant case, the trial court extended the period for filing for reconsideration of sentence from 30 days until Judge White could "[take] a look in the future." Even considering the defendant's motion to "terminate probation condition of restitution and to declare [defendant] indigent," as a motion to reconsider sentence, that motion was denied on August 24, 2017. Thus, the February 9, 2018, "motion to reurge request [for] a restitution hearing" was an untimely motion for reconsideration of sentence. The trial court abused its discretion in considering the motion. A trial court may not revisit a previously denied motion to reconsider sentence. **State v. Perkins**, 2008-0078 (La. App. 4th Cir. 6/25/08), 988 So.2d 793, 801, writ denied, 2008-1675 (La. 3/4/09), 3 So.3d 471. Further, the point of commencement of execution of sentence in this matter was December 17, 2016. See La. R.S. 15:566.2. Absent a timely motion to reconsider sentence, the trial court acted as "one man pardon board" in modifying the restitution obligation on January 4, 2019. See **Gedric**, 741 So.2d at 852. Accordingly, the trial court's ruling of January

20

4, 2019 hereby is vacated, and the defendant's obligation to pay restitution as set forth on December 16, 2016 is reinstated.[14]

This assignment of error has merit.

## MODIFICATION OF RESTITUTION - ABUSE OF DISCRETION

In assignment of error number 2, the State argues the trial court abused its discretion in modifying restitution because the State presented competent evidence that the Louisiana Department of Health (LDH)[15] had paid back approximately four million dollars to the Centers for Medicare and Medicaid Services. Our decision on State assignment of error number 1 causes us to pretermit consideration of this assignment of error.

## LIMITATION OF PROSECUTION UNDER LOUISIANA CODE OF CRIMINAL PROCEDURE ARTICLE 572

In the instant case, the State addresses the claim of Dwaine Woods that the evidence failed to establish a continuing criminal act by him sufficient to defeat the time limitation of La. Code Crim. P. art. 572. The defendant does not raise this claim. Accordingly, we pretermit consideration of this issue.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART; MODIFICATION OF RESTITUTION VACATED; RESTITUTION ORDER OF DECEMBER 16, 2016 REINSTATED.**

---

[14] The State cites **State v. Temple**, 2000-2183 (La. App. 4th Cir. 5/16/01), 789 So.2d 639, 646, for the following proposition "[i]f the trial court granted an indefinite period within which to file a motion to reconsider the sentence, until the motion is filed and acted upon, a defendant would be precluded from appealing his conviction and sentence because a conviction without a final sentence is a non-appealable judgment." We do not agree that, because a defendant may still file a motion to reconsider sentence, a sentence is not "final" for purposes of appeal. See **Lewis**, 207 So.3d at 1081, to-wit:

> In the instant case, the trial judge's statement that he was "maintain[ing] jurisdiction of this case for a period of one year under Article 881.1" is simply an extension of time for defendant to file a motion to reconsider sentence under Article 881.1(A)(1). That extension of time does not divest this Court of jurisdiction. Article 916(3) clearly contemplates that a defendant may file a motion to reconsider sentence during the pendency of his appeal.

[15] Pursuant to 2016 La. Acts No. 300, effective June 2, 2016, the Louisiana Legislature renamed and recreated the "Department of Health and Hospitals" as the "Louisiana Department of Health."

21